Gene N. Chavez, Bar No. 12042
**CHAVEZ LAW OFFICES, PA**
1220 5th St. NW
Albuquerque, NM  87102
gene@chavezlawoffices.com
505-243-4363
*Attorney for Plaintiff Monique Portillo*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

**Monique Portillo,**

       **Plaintiff,**

**vs.**                                                    **Case No. 2:18-cv-00178-SRB**

**Philip Brailsford, an Officer of the**
**Mesa, Arizona, Police Department,**
**Individually,**

**City of Mesa, Arizona, an Arizona**
**municipal corporation, acting through**
**John Meza, Chief of Police City of Mesa;**
**in his Official Capacity**

**Charles J. Langley, an Officer of the**
**Mesa, Arizona, Police Department,**
**Individually,**

**Brian Elmore, an Officer of the**
**Mesa, Arizona, Police Department,**
**Individually,**

**Christopher Doane, an Officer of the**
**Mesa, Arizona, Police Department,**
**Individually,**

**Bryan Cochran, an Officer of the**
**Mesa, Arizona, Police Department,**
**Individually, and**

**Richard Gomez, an Officer of the**
**Mesa, Arizona, Police Department,**
**Individually, and**

1

**Defendants John/Jane Does 1-5,**
**Officers of the Mesa, Arizona, Police Department**
**whose identities have been withheld from**
**Plaintiff, Individually,**

**Defendants.**

## PLAINTIFF'S SECOND AMENDED COMPLAINT
## FOR CIVIL RIGHTS VIOLATIONS

Plaintiff, Monique Portillo, by and through her attorney, CHAVEZ LAW OFFICES, PA (Gene N. Chávez) and brings her Second Amended complaint for violation of her civil rights under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983, and alleges as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 1343.

2.      Venue is proper in this district, pursuant to 28 U.S.C. § 1357, as parties are all residents of Arizona and all of the acts complained of occurred in Arizona. Plaintiff's causes of action arose in Arizona.

### PARTIES

3.      Plaintiff Portillo is a resident and citizen of the state of Arizona at all times relevant.

4.      The City of Mesa (the "City") is an Arizona municipality, organized according to and operating pursuant to the laws of the State of Arizona.  The City is a governmental entity and acted through its agents at all times relevant to the claims herein as a government entity.  Upon information and belief, the agents of the City whose actions and omissions, as alleged herein, form the basis for the Plaintiffs' claims were acting at all material times with the consent and

2

1   authorization of and according to the training and policies of the City.  Upon information and

2   belief, the primary policy-maker and decisionmaker for the City was John Meza. The allegations

3   herein lodged against John Meza are lodged against him in his official capacity.

4       5.   The City of Mesa Police Department ("MPD") is a department of the City and

5   operated through its departmental employees as an arm of the City at all times relevant to the

6   claims herein. Because the MPD is a department of the City of Mesa, the actions of the MPD and

7   its agents that form the basis of the claims herein are attributed to the City of Mesa for purposes

8   of all federal and state law claims. *See Williams v. City of Mesa Police Dep't*, No. 09-1511, 2009

9   U.S. Dist. LEXIS 80391, at *8, 2009 WL 2568640, at *3 (D. Ariz. Aug. 18, 2009); *see also*

10   *Joseph v. Dillard's, Inc.*, 2009 U.S. Dist. LEXIS 120577, at *15, 2009 WL 5185393 (D. Ariz.

11   Dec. 23, 2009); *Flores v. Maricopa County*, No. 09-0945, 2009 U.S. Dist. LEXIS 61713, at **5-

12   6, 2009 WL 2169159, at *2 (D. Ariz. July 17, 2009).

13       6.   Defendant Philip Mitchell Brailsford ("Brailsford") is a former MPD Officer,

14   Badge Number #19861, and was at all times relevant a resident of the State of Arizona. At all

15   times material to this complaint, Defendant Brailsford was acting within the scope and course of

16   his employment as a law enforcement officer operating under color of state law.

17       7.   Defendant Charles J. Langley ("Langley") is a former MPD Officer, Badge

18   Number #10509, and is a resident of the State of Arizona. At all times material to this complaint,

19   Defendant Langley was acting within the scope and course of his employment as a law

20   enforcement officer operating under color of state law.

21       8.   Defendant Brian Elmore ("Elmore") is an MPD Officer, Badge Number #19456,

22   and is a resident of the State of Arizona. At all times material to this complaint, Defendant

23

24                                                                            3

Langley was acting within the scope and course of his employment as a law enforcement officer operating under color of state law.

9.      Defendant Christopher Doane ("Doane") is an MPD Officer, Badge Number #20111, and is a resident of the State of Arizona. At all times material to this complaint, Defendant Langley was acting within the scope and course of his employment as a law enforcement officer operating under color of state law.

10.     Defendant Richard Gomez ("Gomez") is an MPD Officer, Badge Number #15089, and is a resident of the State of Arizona. At all times material to this complaint, Defendant Langley was acting within the scope and course of his employment as a law enforcement officer operating under color of state law.

11.     All of the and omissions giving rise to this Complain occurred in the State and federal judicial District of Arizona.

### FACTUAL BACKGROUND

12.     This is a civil action for monetary damages, arising from the fact that Defendants Brailsford, Langley, Elmore, Doane, and Gomez ("Individually-named Defendants) failed to properly investigated a call-relaying-third-party-information and subsequently used excessive and unconstitutional force against Plaintiff while illegally arresting and detaining Plaintiff for four (4) hours or more, thereby traumatizing and terrorizing Plaintiff.

13.     This is also a civil action for monetary damages in that, after arresting and detaining the Plaintiff, Defendant Brailsford unlawfully shot and killed one Daniel Shaver in Plaintiff's presence, thereby further traumatizing and terrifying her for life.

14.     Plaintiff's federal constitutional claims arise under 42 U.S.C. § 1983, and under the Fourth Amendments to the United States Constitution.

4

15.     The Fourth Amendment to the United States Constitution reads as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

16.     Specifically, on or about January 17, 2016, Plaintiff was on a business trip in association with her employment as a store manager, which trip took her to Mesa, Arizona. The purpose of the trip was management training.

17.     On that day Plaintiff and Luis Nuñez met Daniel Shaver, another hotel guest, who invited Plaintiff and Mr. Nunez into his hotel room to socialize.

18.     Unbeknownst to Plaintiff, sometime after Plaintiff and Mr. Nuñez entered Mr. Shaver's room at the La Quinta hotel, a member of the La Quinta hotel staff placed a call to the local 911 emergency system and reported that someone had reported seeing an individual pointing a gun out of a window at the hotel.  The caller could not identify where the gun was being pointed, did not report that the gun had been pointed at a person, or any particular target, and did not specify if inside holding a gun that was pointing in the direction of the window.

19.     The hotel staff did not treat the report they received as an active shooter situation. Instead, Ms. Leticia Jimenez, one of the hotel front desk employees, headed outside to confirm what room was involved.

20.     Recognizing the room involved in the report as Mr. Shaver's room, and having seen him earlier that evening ordering food, and having seen the Venezia's delivery person heading upstairs, Ms. Jimenez, apparently with hotel management's approval, went up to Daniel Shaver's room.

21.     Upon information and belief, Ms. Jimenez was unarmed and unafraid that Daniel Shaver posed any serious threat to her or others. Upon information and belief, her statement to the police after the shooting indicated what she observed when she reached Daniel Shaver's room, the door was open, not closed.

22.     The MPD officers who responded to the 911 call and went to Daniel Shaver's room, including Defendants Brailsford, Langley, Doane, Elmore, Cochran and Gomez, could have and should have obtained that same information from Ms. Jimenez before they proceeded to Daniel Shaver's room.

23.     Upon information and belief, Ms. Jimenez could see the people inside Daniel Shaver's room through the open door and saw a large Hispanic male with black hair, facial hair, and a black jacket with what appeared to be a rifle in his hands.

24.     Upon information and belief, Ms. Jimenez actually spoke to Daniel Shaver at his room and noted that she thought she may have been observing the sale of a rifle.

25.     Sometime between approximately 8:30 and 9:15 p.m. on January 18, 2016, multiple MPD officers including Defendants Brailsford, Langley, Doane, Elmore, Cochran and Gomez arrived at the La Quinta hotel in response to the 911 call.  Defendant Langley was the senior responding officer and took command of the other officers who arrived at the scene.

26.     Defendant Langley coordinated an immediate action team of officers including Defendants Brailsford, Elmore, Doane, Cochran and Gomez to go and secure room #502 – Daniel Shaver's room.  Those officers ultimately moved to the fifth floor of the La Quinta hotel and took positions outside room #502 under Defendant Langley's command.

27.     Upon information and belief, at the time he arrived at the La Quinta hotel, Defendant Brailsford was a lightly experienced officer whose prior conduct and actions indicated

6

a dangerous immaturity, an unwillingness or inability to exercise personal restraint, and a willingness to employ inappropriate, unwarranted and excessive levels of force and violence in his activities while on duty.

28.     Upon information and belief, Defendant Brailsford had been involved in an excessive use of force in connection with an incident at a convenience store that was well known to MPD officials and gave them reason to question his fitness for duty, to know of his predilection for employing excessive degrees of violence and force, and to be on notice of his corresponding danger to the public.

29.     More specifically, in a video captured on or about September 27, 2015 (several months before the shooting of Daniel Shaver) a member of the public appears to be subjected to an excessive and unjustified use of force by Brailsford.  A copy of that video can be viewed at https://www.youtube.com/watch?v=1HEZm5em3dY.   MPD was well aware of that incident because it resulted in a citizen complaint, investigated internally under IA No. 2015-238.

30.     The failure of the City of Mesa and MPD to suspend, terminate or retrain and properly supervise Brailsford after this earlier incident constituted an endorsement of Defendant Bailsford's bad acts.  In essence, it was an announcement of the City's *de facto* policy, to wit: that documented unlawful arrests, abuses of force and/or excessive force would go unpunished and essentially deemed as permitted. As a result of the City of Mesa and MPD failure to acct, they wrongfully exposed Plaintiff and Daniel Shaver to a known threat and unreasonable risk of danger posed by Brailsford's uncontrolled temper and willingness to exceed appropriate use of force boundaries irrespective of his training and MPD policies.

31.     On the night of January 18, 2016, Defendant Brailsford was carrying an AR-15 weapon as his duty weapon.  On that rifle he had installed a customized dust cover bearing the

interior inscription "You're Fucked" and bearing an exterior inscription bearing a Spartan helmet and the phrase "molon labe".  "Molon labe" is a classical Greek term translating as "come and take them," taken from a Greek tale stating the defiance of King Leonidas to lay down his weapons and surrender to an invading enemy.

32.     Upon information and belief, Defendant Brailsford's use of the customized dust cover violated MPD policy and reflected Brailsford's disregard for authority and governing police policy as well as a level of personal immaturity inconsistent with the responsibilities of sworn peace officer.

33.     Upon information and belief, Defendant Brailsford's use of the customized dust cover and also reflected his disrespect for the rights and interests of the public he was sworn to serve and a dangerous predilection for excessive force and violence that the MPD negligently and recklessly failed to identify and address.

34.     Thus, based on the foregoing, MPD had sufficient information that Defendant Brailsford represented a threat and danger to members of the community, like Daniel Shaver and the Plaintiff, on the listed date.  Yet, MPD failed to take the supervisory and protective actions necessary to eliminate that threat and protect Daniel Shaver and the Plaintiff from Defendant Brailsford.

35.     The City of Mesa's failure to safeguard Plaintiff, Daniel Shaver, from Brailsford knowing his proclivities and excesses constitutes grossly negligent, reckless and intentional wrongful conduct rendering MPD and the City of Mesa liable to the Plaintiffs for all harms arising out of Daniel Shaver's killing.

36.     In the event that MPD claims not to have known about the dust cover, or about Defendant Brailsford's prior use of excessive force, or to the extent that MPD officials had

8

overlooked or missed such signs of Brailsford's dangerous character, personality and actions, then the City of Mesa, acting through MPD and its agents, failed in its duty to properly screen MPD officers for such issues and to protect Daniel Shaver, the Plaintiffs, and others by not hiring persons with the traits and predilections of Defendant Brailsford. Also, in that event, Defendant City of Mesa failed in its duty to the Plaintiffs and Daniel Shaver to properly inspect, oversee, supervise, train and control Defendant Brailsford.

37.     The facts further indicate that MPD had failed in its duty to Daniel Shaver and the Plaintiffs to have adequately and appropriately trained and supervised Defendant Brailsford prior to and on January 18, 2016, so that he would honor and demonstrate appropriate self-restraint, de-escalation techniques, and respect for the public and the policies of the MPD. The facts also indicate that MPD had failed in its duty to adequately and appropriately train and supervise Brailsford so that he would not employ excessive or inappropriate levels or types of force, as he did against Daniel Shaver.

38.     Upon information and belief, the La Quinta employees who decided to call 911 or directed the call to 911 had access to greater information than they relayed to the 911 operator about the circumstances occurring in Daniel Shaver's hotel room.

39.     Upon information and belief, had those employees provided to either the 911 operator or the MPD officers responding to the 911 call the additional information they knew about Daniel Shaver, including his general demeanor, his positive interactions with staff a day earlier and on the 18th, and his having just recently ordered food, they would have provided material information that would have materially reduced the responding MPD police officers' alleged perception of what risks of harm existed at the hotel that night. It was negligent and reckless for the La Quinta hotel staff to advise the 911 operator and the responding MPD officers

9

1   in the way they did, omitting material information the La Quinta staff knew about the occupant

2   of the room where a rifle was supposedly spotted.

3        40.     The window screen on Daniel Shaver's hotel room at the La Quinta hotel on

4   January 18, 2016, was secured.  It could not easily be removed or moved aside by a hotel guest.

5   Therefore, there is no possibility that anyone had actually extended a rifle outside the window

6   prior to the 911 call that brought MPD officers to Mr. Shaver's room.

7        41.     Upon information and belief, the La Quinta hotel staff on duty on January 18,

8   2016 knew of the fixed condition of the window screen on Daniel Shaver's room. They could

9   have easily informed the MPD of that fact when MPD officers arrived at the hotel that evening in

10  response to the 911 call.  Upon information and belief, however, they did not do so, and the

11  MPD officers never asked any La Quinta staff before Defendant Brailsford shot and killed

12  Daniel Shaver what the condition or status of his window or window screen were.

13       42.     Upon information and belief, the MPD officers who responded to the 911 call,

14  including Defendants Langley, Brailsford, Doane, Cochran, Elmore and Gomez, could have

15  easily confirmed the fixed condition of a screen on the outside of Daniel Shaver's hotel room—

16  thereby demonstrating that no firearm could have been pointed out of the window.

17       43.     Had Defendants done so, they would have inevitably concluded that the report of

18  a rifle pointed out of a window could not have been true by simply observing the window from

19  outside, especially with a flashlight and/or binoculars or rifle scopes, which should have been

20  standard equipment for officers on evening patrol duty. Upon information and belief, no one

21  from MPD directed that the room window conditions be checked or asked about them to test the

22  veracity of the information in the 911 call. That choice—to ignore obvious and easily available

23

24                                                                                          10

1  information before engaging in a course of action likely to cause harm—was perpetrated by

2  Defendants with deliberate indifference to the rights and safety of Plaintiff and Mr. Shaver.

3       44.    The MPD officers who went to Daniel Shaver's room failed to conduct an

4  adequate and appropriate inquiry into the facts confronting them, and upon information and

5  belief did not even conduct the rudimentary steps of speaking to the persons who supposedly saw

6  a rifle through a hotel window or of speaking to hotel staff members like Ms. Jimenez to learn

7  the critical information known to them about Daniel Shaver and the situation in Daniel Shaver's

8  room that would have confirmed that Daniel Shaver posed no threat to anyone, including the

9  MPD officers.

10       45.    Had any of the MPD officers who responded to the 911 call before Daniel

11  Shaver's execution properly investigated the situation at the hotel, they would have learned

12  through just a short conversation with Ms. Jimenez and the rest of the on-duty staff at the hotel

13  all the positive and non-threatening things Ms. Jimenez and the others at La Quinta knew about

14  Daniel Shaver, including those facts about his demeanor, interactions with others, and his recent

15  ordering of dinner.

16       46.    The MPD officers also would have learned through an appropriate inquiry of

17  hotel staff that Ms. Jimenez had actually felt comfortable enough to go up to Daniel Shaver's

18  room unescorted and unarmed shortly before their arrival.

19       47.    The MPD officers also would have learned through an appropriate inquiry of

20  hotel employee Ms. Jimenez that the rifle in the room was being handled by a large Hispanic

21  male with facial hair wearing a black jacket, not Daniel Shaver, that the room door had been

22  open when Ms. Jimenez arrived there just a short time ago, and that she thought she might have

23  been observing a sale, not threatening activity.

24            11

48.    The failure of the responding MPD officers to obtain the important information Ms. Jimenez and other staff or witnesses at the La Quinta hotel knew was a violation of the applicable standard of care for police work and was perpetrated with deliberate indifference to the constitutionally protected rights of Plaintiff, Mr. Shaver, and others. It resulted in needless danger. It allowed the MPD officers to reinforce their preconceived, but factually ignorant beliefs that they were somehow walking into an active shooter-type scenario, when the hotel staff could have confirmed easily that the situation was nothing of the sort. This reckless and negligent failure to investigate contributed to the wrongful killing of Daniel Shaver by Defendant Brailsford.

49.    Sometime after Ms. Jimenez left Daniel Shaver's room, Mr. Nunez excused himself and left the room. Upon information and belief, Daniel Shaver and Ms. Portillo continued speaking, with Daniel Shaver sharing information about his family.  Neither of them were engaged in any activity creating a threat of harm to others.

50.    As the senior responding officer, Defendant Langley was responsible for tactical decisions of the MPD officers under his command and for properly supervising the actions and appropriately restraining the use of force of those on his team. Defendant Langley was responsible through his actions and failures to act, including those listed above, for decisions and actions that resulted in him and his team members making false and dangerous assumptions, employing inappropriate and excessively aggressive and violent tactics, and inappropriately escalating the situation outside Daniel Shaver's room.

51.    By his actions and his failures to act appropriately and in accordance with the appropriate standards of care for a police officer in his situation, Defendant Langley encouraged overly aggressive and inappropriately violent actions by those under his command including

12

Defendant Brailsford, and encouraged the inappropriate, unlawful and excessive use of force by Brailsford that caused Daniel Shaver's death. Defendant Langley therefore facilitated, encouraged, motivated and caused Daniel Shaver's death.

52. First, the MPD officers who went to Daniel Shaver's room had no reports that a single shot had been fired or that there was any sort of "active shooter" situation involved. The MPD officers who went to Daniel Shaver's room had no reports that anyone in Daniel Shaver's room had aimed or pointed a rifle at any person.

53. The MPD officers who went to Daniel Shaver's room knew that a material amount of time had passed since the report of someone seeing a rifle with no shots fired at all, and no one threatened.

54. The MPD officers who went to Daniel Shaver's room had not received any reports of anything else unusual or untoward happening, like loud noises, or screams or shouts coming from Room 502. All was in fact, quiet at the hotel, which logically indicated that the rifle seen in Room 502 may not reflect an imminent threat.

55. Those same MPD officers had no personal description of the person who supposedly was holding the rifle.

56. The MPD officers who went to Daniel Shaver's room did know, or should have known, that the 911 call they were responding to was not reporting information or details the caller had seen, but just represented a second-hand report of what the caller had been told by someone else. The MPD officers therefore did not know if the person originally reporting the issue had supposedly seen a weapon actually extended outside a window, or just a person holding the weapon inside the building.

13

57. Defendant Langley recognized that having just three officers with him was sufficient to address the situation involving Room 502, as he ultimately sent two officers back to the lobby to collect a room key and to call Room 502.

58. Defendant Langley could therefore have asked some of his team members to conduct the follow-up inquiries mentioned above while the remaining officers surrounded the room, or he could have directed MPD officers remaining downstairs to ask the next arriving officers to conduct that investigation for him and radio the results.

59. Obtaining the appropriate background was a safer practice for both Plaintiff and Daniel Shaver as well as those persons in all surrounding areas of the hotel than the MPD officers rushing off heavily armed and assuming that heavy firepower might need to soon be deployed in the middle of an occupied hotel's hallway. Defendant Langley and the other officers going to Daniel Shaver's room with him therefore elected to employ tactics that unreasonably put lives at risk.

60. Defendant Langley elected to deploy his forces as if an imminent threat of an active shooter threatening all hotel guests existed, though he had no evidence of that, and the little information he had suggested exactly the opposite. Upon information and belief, Defendants Brailsford, Elmore, Doane, Cochran and Gomez agreed with and complied voluntarily with the tactics selected by Defendant Langley, though they also had no knowledge of facts justifying their tactics.

61. Defendants Langley, Brailsford, Elmore, Doane, Cochran and Gomez failed to consider the possibility that there were myriad explanations for a hotel guest having a rifle in their room that were innocent and involved no criminal or threatening activity. The failure to

14

consider these possibilities was a contributing cause of the violations of Plaintiff's constitutionally protected rights.

62. Upon information and belief, the rash, irresponsible and dangerous mindset Defendants Langley, Brailsford and the other MPD officers appearing with them outside Daniel Shaver's hotel room had already adopted before they ever saw Daniel Shaver is evidenced by the reckless attitude they displayed toward other hotel guests endangered by their actions.

63. Moreover, upon information and belief, the aforementioned rash and dangerous behavior was either explicitly or implicitly condoned by the City, MPD, and John Meza, Chief of Police.

64. Defendant Langley's entire team outside Room 502 knew that Langley and officers Brailsford and Elmore were armed with AR-15 rifles, and that officers Doan, Cochran and Gomez also had deadly firearms on them.

65. Sergeant Langley and the other officers understood well that the penetrating force of an AR-15 round or even the rounds from their sidearms was sufficient to pass through surrounding construction materials, and that discharging their weapons in the hallway of the La Quinta threatened to send bullets, bullet fragments or other dangerous shrapnel or debris into surrounding rooms in a manner that could severely injure or kill other guests.

66. The MPD officers did not seek to clear rooms around, above and below the targeted room 502 so that there would be less risk to other guests. Rather, with no reliable or corroborating evidence justifying their conclusions, and no adequate attempts to obtain the same, the MPD officers making up Defendant Langley's team made wild assumptions that Room 502 contained an individual so threatening to the rest of the hotel and the officers that they could not even risk clearing other rooms first before launching their assault against Room 502. After

1  Plaintiff was terrorized and Daniel Shaver was killed, the MPD officers had to clear at least one

2  nearby room to ensure that no guests within had been hurt.

3      67. As the MPD officers comprising Langley's team arrived near Room 502, Defendant

4  Langley announced his plan to get Daniel Shaver and Monique Portillo out of the room, bring

5  them to about six feet in front of the officers and "put them out."

6      68. Before the MPD officers outside Room 502 made direct contact with Daniel Shaver,

7  they heard both a male voice and a female voice coming from the room. Upon information and

8  belief, they heard voices speaking in a conversational tone, not anything that indicated any

9  threatening behavior or conditions.

10      69. After an MPD officer telephoned into Room 502, Daniel Shaver and Ms. Portillo

11  voluntarily exited in compliance with the MPD officers' request. They did not hesitate or delay

12  or express any resistance or reluctance to comply.

13      70. Yet, Defendant Langley set a harsh and directly threatening tone with Daniel Shaver

14  and Ms. Portillo once they began to exit the room. From that time until Daniel Shaver was shot

15  and killed by Defendant Brailsford, Defendant Langley engaged in a series of aggressive,

16  threatening and confusing orders that heightened the aggressiveness of those officers with him

17  and improperly increased their expectation that they had something to fear from Daniel Shaver,

18  should be prepared to shoot him at the slightest movement, and were authorized and encouraged

19  to do so by their commanding sergeant.

20      71. Investigating Detective Sipe of the MPD has viewed the AXON body camera

21  evidence captured of the killing of Daniel Shaver by the cameras worn by Defendants Brailsford

22  and Doane.  Detective Sipe has explained that "[a]t approximately twelve minutes and fifty-three

23  seconds of the video" Daniel Shaver came out of his hotel room and "was already on his hands

24

and knees" when Sgt. Langley shouted for both Daniel Shaver and Ms. Portillo to get on the ground. Daniel Shaver was obviously compliant and offered no resistance.

72. Daniel Shaver was dressed in just underwear, loose athletic shorts and a t-shirt. He was not wearing clothing in which he could conceal a rifle, and none of the MPD officers saw anything on Daniel Shaver's body or formed by his clothes that suggested he had any weaponry of any kind on his person.

73. Nothing about Plaintiff suggested she had any sort of weaponry on her, and indeed both Mr. Shaver and Ms. Portillo were completely unarmed as they interacted with the MPD officers in the hallway at the La Quinta hotel.

74. Yet, as Daniel Shaver and Ms. Portillo exited the hotel room and entered the hallway surrounded by the multiple MPD officers Defendant Langley stated, 'Alright, if you make a mistake another mistake, there's a very severe possibility you're both going to get shot." He said this despite the fact that both individuals had complied with his direct instructions up until that point.

75. Both Plaintiff and Mr. Shaver were obviously traumatized, frightened and submissive. The MPD officers outside his room could see this in their physical posture and movements and could hear it in their voices—particularly when Daniel Shaver tried to speak to them. When Mr. Shaver attempted to speak, Sergeant Langley said, "This is – shut up. I'm not here to be tactful and diplomatic with you. You listen, you obey. For one thing, did I tell you to move young man?" To which Daniel Shaver responded, "No, sir. No, sir. No, sir. No, sir."

76. As Defendant Langley continued to issue him orders, Daniel Shaver appeared both compliant and confused to all the MPD officers who could see him in the hallway. At one point,

17

Defendant Langley ordered Daniel Shaver to place his hands on the back of his head and interlace his fingers. Daniel Shaver was again compliant.

77. Defendant Langley then told Daniel Shaver to cross his left foot over his right foot. Daniel Shaver complied with this but appeared to be confused as to which foot Defendant Langley had ordered him to cross. He crossed his feet both ways before finally crossing his feet as Defendant Langley had instructed. Daniel Shaver's actions showed he was concentrating on behaving just as the MPD officials wanted.

78. Defendant Langley then told Daniel Shaver, "if you move, we're going to consider that a threat and we are going to deal with it and you may not survive it." This was the second threat against Daniel Shaver's life in a matter of minutes despite Daniel Shaver's repeated and unabated attempts to comply with the police instructions.  Plaintiff was present for this second threat and fully aware that the police were threatening to shoot Mr. Shaver and, implicitly, her, too.

79. After the MPD officers took Plaintiff into custody, Langley again told Daniel Shaver "to listen to his instructions and 'do not make a mistake.'"  Nowhere in MPD's or the City of Mesa's policies, or the law governing use of force by police officials, is the use of deadly force ever justified because a suspect "made a mistake."  Yet, Defendant Langley expressed his clear belief and directives to his subordinate officers that they could and should shoot Daniel Shaver if he simply made a mistake.

80. Defendant Langley continued to confusingly instruct Daniel Shaver to make various bodily movements, such as requesting that Daniel Shaver push himself up to a kneeling position while also keeping his legs crossed. When Daniel Shaver accidentally uncrossed his legs while moving to a kneeling position, Sergeant Langley immediately shouted at Daniel Shaver to keep

18

his legs crossed, to which Daniel Shaver crossed his legs, and said, "I'm sorry. I'm sorry. I just pushed my --." Defendant Langley did not let Daniel Shaver complete his sentence.

81. Daniel Shaver then apparently put his hands behind his back as if waiting to be handcuffed, about which investigating Detective Sipe of the MPD has noted, "This did not appear to be an exaggerated movement and looked similar from the vantage point of the video as when someone is handcuffed with officers behind them."

82. However, Defendant Langley started screaming about Daniel Shaver's hands, even though his initial commands of Daniel Shaver should do with his hands was loud and indiscernible.

83. Defendant Langley shouted for Daniel Shaver to place his hands in the air and Daniel Shaver "complied and rapidly put his hands above his head." Then Daniel Shaver said, "No, please do not shoot me. I'm … I'm trying to just do what you –"in a voice that, according to Detective Sipe, "appeared to be panicked."

84. At that point, the MPD officers near Daniel Shaver in the hallway, including without limitation Defendant Brailsford, could hear Daniel Shaver audibly sobbing including when he said "yes sir," in response to Defendant Langley's question about whether he understood what he was being told to do.

85. Defendant Langley then shouted at Daniel Shaver to crawl towards him. Again displaying his prompt and respectful compliance with the police commands, Daniel Shaver dropped to his hands and knees and could audibly be heard sobbing and stating 'Yes, sir' by the MPD officers as he began to crawl forward.

86. The MPD officers had already taken Monique Portillo into custody. Defendant Langley commanded Monique Portillo to crawl toward them, and then had Defendant Gomez

1  walk forward to take her into their custody when she "was approximately no more than 6 feet in

2  front of us," per Defendant Langley.

3       87. When the MPD officers had taken her into custody, they left her purse on the floor of

4  the hallway in the direct path that Defendant Langley was ordering Daniel Shaver to crawl on. In

5  fact, when Defendant Brailsford shot Daniel Shaver, Daniel Shaver collapsed on the purse.

6       88. Leaving the purse in the hallway was reckless and negligent, inappropriate, and

7  violated the standard of care for police work. It placed Daniel Shaver at the risk of imminent

8  death by shooting to leave the purse in the hallway and make him crawl towards and over it. This

9  was especially so given the threats and instruction vocalized by Defendant Langley to his team

10  members that if Daniel Shaver moved it was to be taken as a threat and Daniel Shaver might not

11  survive. Upon information and belief, it was inevitable and imminently foreseeable that someone

12  having to crawl over or around a purse obstructing their path would make movements of their

13  arms and/or legs, and that, given Defendant Langley's admonitions, one or more of his officers

14  might open fire and hurt or kill the individual without justification.

15       89. While Plaintiff was not shot, the actions that Defendants took toward Daniel Shaver

16  in front of her not only left her suffering likely lifelong trauma but also indicate just how

17  indifferent Defendants were to both Mr. Shaver and Plaintiff's rights and safety.

18       90. The fact that the MPD officers forced Daniel Shaver to crawl in a manner and in

19  clothing that forced his shorts down in an embarrassing fashion, all the while intending to shoot

20  him if he moved his hand back to prevent the shorts from falling was also deliberately indifferent

21  to the rights of Mr. Shaver and demonstrates that the policy of the City, MPD, and these

22  Defendants, either explicit or *de facto*, was the driving force behind the violations of Plaintiff's

23  rights and the rights of other people, including Daniel Shaver.

24                                                                              20

91. The fact that Defendant Brailsford shot Daniel Shaver and killed him exhibits intentional, criminal conduct falling far below any standard of care applicable to Brailsford and all those MPD officers acting in concert with him and was perpetrated willfully, wantonly, and with deliberate indifference to the rights of Mr. Shaver, Plaintiff, and others.

92. The willingness and intent of Defendant Langley to promote, direct and encourage the type of irresponsible, inadequate, reckless and aggressive tactics described above was a contributing cause of dangerous emotions of fear, anxiety and aggression among those he led, and caused and/or encouraged Defendant Brailsford to shoot Daniel Shaver. This course of behavior was undertaken with deliberate indifference to the rights of Plaintiff, Mr. Shaver, and others. It disregarded appropriate standards of police leadership and conduct, endangering immediately both the occupants of Room 502 and of all surrounding rooms and constituting a contributing cause to the wrongful killing of Daniel Shaver and the violation of rights suffered by Plaintiff.

93. At the time Daniel Shaver was crawling in the hotel hallway, his athletic shorts had fallen considerably down his rear end, exposing significantly his underwear. This would have provided further confirmation to Defendant Brailsford and the other officers assembled there that Daniel Shaver had no weapon hidden on him, especially not in the waistband of his shorts. There was no reason for the Defendant MPD officers to believe that Daniel Shaver was carrying a weapon of any kind – whether a rifle as described in the 911 call or something else.

94. Upon information and belief, Daniel Shaver made no moves and took no actions of any kind that indicated a threat justifying the use of deadly force against him. In fact, the last words Daniel Shaver said was the submissive phrase: "Yes, sir. Please." But then, Officer Brailsford killed him with five rounds fired from his AR-15 weapon.

95. No other officer present fired their weapons.

96. There was no reason for anyone to open fire.  Daniel Shaver did nothing to warrant being shot.

97. Daniel Shaver's killing was unprovoked, unwarranted, unjustified, callous, depraved, vicious and evil.  It reflected a conscious decision by Defendant Brailsford to shoot an unarmed and innocent man who was complying with police orders, sobbing, and begging not to be shot.

98. The decisions made and tactics employed by Defendants Langley, Brailsford, Elmore, Doane, Cochran and Gomez display and stem from a lack of adequate training, a lack of adequate screening and a lack of adequate supervision, as well as personal inclinations created by dangerous and unsuitable predispositions, and inadequate and improper policies, procedures and practices that encouraged an overly-aggressive, unjustifiably hyper-vigilant state and a predilection for violent confrontation that posed substantial and unwarranted dangers to those interacting with these officers, including Daniel Shaver. The policies of the City, MPD, and then-Chief of Police John Meza were the driving force behind the violations of rights endured by Plaintiff and the killing of Daniel Shaver.

99. The actions and failures to act of Defendants comprising Defendant Langley's team, including the decisions and directions provided by Defendant Langley, and the voluntary compliance with such decisions and directions by Defendants Brailsford, Doane, Elmore, Cochran and Gomez, reflects inadequate or irresponsible and inappropriate police training and practices by the MPD and the City of Mesa, as well as highly inappropriate personal dispositions for responsible police work among all the Defendants named in this paragraph. They each, individually and collectively, in cooperation with and support of one another, employed tactics

that allowed matters to escalate into an excessive and unreasonably dangerous deployment of force without heed of the actual facts indicating there was no need or justification for such force.

100.    Daniel Shaver's death, therefore, could also have been avoided through proper selection and hiring of MPD officers, and by proper training and supervision of Brailsford, Langley and the other MPD officers on scene at Daniel Shaver's killing.

101.    Defendant City of Mesa failed to properly select and hire officers for the MPD and therefore it allowed Daniel Shaver to be confronted on the evening of January 18, 2016, by individual officers either inappropriately disinclined or unable to follow appropriate limitations on police use of force, or unable to absorb and implement training on appropriate practices for investigation of the total situational circumstances facing an officer or team of officers at a response scene, appropriate and proportional employment of force, and de-escalation techniques.

102.    Defendant City of Mesa, through its MPD and the MPD officials, failed to properly train, screen, supervise and direct each of the Defendants comprising Langley's team (Langley, Brailsford, Doane, Cochran and Gomez). The reckless and indifferent actions of such officers display a conscious disregard by the MPD for appropriate screening, hiring, training, supervision and interventions needed to ensure compliance with applicable and accepted use of force standards, investigatory standards and tactical response standards. Had they done so, Daniel Shaver would not have been killed and the remaining damages for which relief is sought here would not have occurred.

103.    Upon information and belief, had the members of Defendant Langley's team been properly trained, screened, supervised, and directed, the Defendants on the Langley team would have employed measures or actions that completed appropriate investigations before assessing final approach tactics, would have employed de-escalation tactics, and would not have engaged

23

in the aggressive, confusing and irresponsible instructions Defendant Langley insisted on. In short, Daniel Shaver would not have been killed.

104.   Each of the Defendants comprising Defendant Langley's team also bears their own individual responsibility and liability for not overcoming the poor training and practices that encouraged them to not question or investigate what was really happening in Room 502, and for not challenging the inappropriate and dangerous tactics employed at Defendant Langley's direction as discussed above.

105.   The actions and failures to act of Defendant City of Mesa, through its individual agents, including but not limited to Chief of Police John Meza and the individually named Defendants in this case, and through its MPD, as alleged above, violated the standard of care applicable to Defendant City of Mesa, were evil and malicious, or, at a minimum, reckless and/or negligent, and were a driving force behind the ciolation of Plaintiff's rights and Daniel Shaver's wrongful killing.

106.   The actions and failures to act of the Defendants Brailsford, Langley, Elmore, Doane, Cochran and Gomez, as alleged above, violated the standard of care applicable to their positions as police agents of the City of Mesa, were evil and malicious, or, at a minimum, reckless and/or negligent, and were a contributing cause of Daniel Shaver's wrongful killing.

107.   As a direct and proximate cause of Defendants' bad acts, Plaintiff has suffered egregious and permanent harm and loss in multiple forms, including both non-economic pain and suffering, costs, expenses and economic losses and negative impacts on Plaintiff's ability to enjoy life.  Plaintiff is entitled to full compensation for all her losses.

108.   Each of the MPD officers at the scene of Daniel Shaver's killing, including Defendants Brailsford, Langley, Doane, Elmore, Cochran and Gomez are jointly and severally

liable, along with the City of Mesa, for Daniel Shaver's death and all the harms inflicted on him and Plaintiffs Laney Sweet and her minors.  Each of them had an independent duty to ensure that they behaved rationally, carefully, and investigated all the relevant facts before putting themselves, as a team, in a situation where Daniel Shaver's life became endangered.

109.    By complying with the deliberately indifferent, sub-standard leadership and inappropriate directives of Defendant Langley, the other Defendants knowingly and intentionally placed Daniel Shaver and others in harm's way and at an unreasonable risk of death. By cooperating with and facilitating Defendant Langley's lack of investigation, belligerent and bullying and confusing tactics, and gross disregard for the true circumstances his team faced, each of the MPD officers named as Defendants herein aided, abetted, conspired with and facilitated the killing of Daniel Shaver.

110.    By allowing officer Brailsford to operate with an AR-15 personally modified to express disregard and even disgust for the public he encountered, the other officers who were aware of those circumstances allowed a dangerous and deadly instrument to be placed in the hands and discretion of an unsuitable personality. The MPD officers are not entitled to a "Nuremburg defense" – claiming they were just following orders. They each owed an individual duty of care to Plaintiff, to Daniel Shaver, and to the public and Defendants breached that duty in multiple ways by failing to stop the missteps and errors outlined above that lead to the deprivation of Plaintiff's rights and to Daniel Shaver's death.

111.    Immediately after he shot Daniel Shaver, Defendant Brailsford was told to leave the area by Defendant Langley. He turned off his AXON body camera.

112.    MPD policy prohibits an officer involved in a shooting to confer with other officers involved in the shooting or any family member other than a spouse until after an

investigation has been conducted. Upon information and belief, all the individually-named Defendants named in this action knew that policy. MPD's DPM 2.1.10 (Use of Force) mandates that the "supervisor shall immediately separate the involved members and/or witnesses and order them not to discuss the investigation, including the interview, with any unauthorized person. Authorized persons include: Homicide Unit investigators, involved members attorneys and/or Department representative, spouse, health care provider, and clergy."

113.    Yet, in violation of that policy an MPD officer encouraged Defendant Doane to go to Defendant Brailsford in the parking lot outside the hotel shortly after the shooting. Defendant Doane turned off his AXON body camera before it could record anything he might have said to Brailsford, or that Brailsford said to him.

114.    While the investigation into Daniel Shaver's killing started, Defendant Brailsford, along with other officers who had been with him at the scene of the killing, were taken to an off-site location, apparently for some two to three hours before MPD Detective Sipe was able to interview Officer Brailsford and others about the incident.

115.    To the extent that any of the Individually-named Defendants were allowed prior to their interview for the formal investigation into Daniel Shaver's killing to communicate with one another, either directly or indirectly through proxies such as union representatives, counsel or other MPD officers, such communication was a knowing violation of the MPD policies.

116.    To the extent that Defendant Brailsford or any other named Defendant was allowed to communicate with a family member other than a spouse before they completed their interviews for the formal MPD investigation into the killing, such communication was a knowing violation of MPD policy.

117.    Defendants Langley, Brailsford, Doane, Elmore, Cochran and Gomez were required to, and did, complete written incident reports about the shooting of Daniel Shaver. Not coincidentally, incident reports written by the MPD agents who had been part of Langley's team fail to adequately convey Daniel Shaver's plea to the MPD officers not to shoot him, his audibly crying out of fear of what would happen, the confusing and belligerent nature of the instructions offered by Langley, and Daniel Shaver's continued attempts to comply with Sergeant Langley's changing orders despite his obvious inability to completely understand Sergeant Langley's instructions.

118.    In contrast, many of those same incident reports share references to a perceived threat, even though Daniel Shaver did nothing that would amount to a threat. The similar omissions from the reports and attempts to portray Daniel Shaver as threatening and uncooperative suggest collusive attempts to cover up the true facts, impede the investigation into Daniel Shaver's killing, make the shooting appear justified, and to hinder the investigation, any prosecution and any administrative proceedings or civil actions that could implicate or expose any of the Defendants to sanction, prosecution, or civil liability. As such, they represent obstruction and further violations of the Plaintiffs' rights to know the truth and to have police officers and city officials fully and truthfully participate in any investigation or other proceeding involving the killing.

119.    Defendant City of Mesa terminated the employment of Defendant Brailsford.

120.    Upon information and belief, Defendant City of Mesa had served Defendant Langley with a notice of an internal investigation regarding his official conduct as an MPD officer, and Defendant Langley elected to retire rather than face possible discipline and loss of retirement benefits.

121.    Upon information and belief after diligent investigation, at no point in time was Plaintiff suspected of any crime prior to or at the time of this incident.

122.    After Plaintiff was forced to witness the police slaying of Daniel Shaver, Plaintiff, who was crying and screaming with fear and trauma while still handcuffed, was shouted at by several Defendants, who used profanity, telling her to "shut the fuck up!" and similar remarks, which further traumatized her.

123.    Plaintiff was taken, still handcuffed, from the scene of Daniel Shaver's homicide by Defendants.  Plaintiff was taken to a bench outside the hotel where she was then handcuffed to the bench with another officers' handcuffs.  The handcuffs continued to be tight and painful, leaving red marks on the Plaintiff's skin.

124.    Defendant Jane Doe asked Plaintiff a number of questions, including her purpose for being in Arizona, and what had happened leading to the death of the deceased, Daniel Shaver.  Defendant Jane Doe repeatedly interrupted Plaintiff's report of the events to interject her opinion, stating, among other things, that the deceased Daniel Shaver "could have been a terrorist," and similar comments that seemingly appeared to justify the execution of Mr. Shaver. At no time did Defendant Jane Doe inform Plaintiff why she was being detained, what crime she was suspected of having committed, or any information as to why she was being treated in this way.

125.    Eventually, Plaintiff was escorted to a small sport utility vehicle (SUV), where she was seated, still painfully handcuffed, for hours. Several officers came and went in the vicinity, and Plaintiff inquired why she was being held and why she was handcuffed. She was not answered.

28

126.    After several hours, Plaintiff was approached by a Mesa Police Department detective, who interviewed her and audio recorded the interview. The detective apologized profusely to the Plaintiff, asked if she was comfortable, asked whether the handcuffs were painful, asked if she needed to drink water.

127.    Eventually, the Plaintiff was removed from the police SUV and, still handcuffed, led across the hotel lobby. Plaintiff felt extremely humiliated, as there were still guests in the hotel lobby.  The handcuffs were still tight and painful.

128.    The detective asked other officers present, "why is she still handcuffed?," recognizing that at least one member of MPD could understand that Plaintiff was never a suspect of any crime that had been committed.  At this point, the handcuffs were finally removed.

129.    Plaintiff was allowed to retrieve her belongings from her room and was assigned another room by the hotel.

130.    Plaintiff was finally able to rest in her room around 5:00 a.m. the day following the police homicide off Daniel Shaver.

## SUMMARY OF ALLEGATIONS

131.    In summary, Defendant Langley and his Mesa Police team responded to a 911 call reporting that someone was seen pointing a rifle out La Quinta hotel room window in Mesa, Arizona in January, 2016.

132.    No threats, shots, or descriptions of any suspect were reported. Defendants had no reason to believe that an "active shooter" situation existed when Defendant Langley assumed command and directed a team of other officers to immediately take lethal positions in retrieving victim Plaintiff and Daniel Shaver a hotel room.

133.    Defendant Langley made the decision to not gather information from hotel staff about Daniel or his room, though hotel staff had just gone to check on Daniel, spoke with him, and observed an entirely different man holding a rifle in what hotel staff thought was just a gun sale transaction.

134.    When Plaintiff and Daniel Shaver voluntarily exited the hotel room to the hallway in response to a phone call from a Mesa PD officer, Defendant Langley personally barked threats of death to a compliant and terrified Plaintiff and Daniel Shaver and his police team.

135.    Defendant Langley instructed Daniel Shaver in Plaintiff's presence that any "mistake" by Mr. Shaver in complying with Langley's personally issued instructions authorized any officer to shoot and kill Mr. Shaver.

136.    Defendant Langley included thereafter alternating and hopelessly confusing instructions to Plaintiff and more so to Mr. Shaver: move, then do not move or else Mr. Shaver would be shot, then to crawl forward with legs crossed and hands in the air with the threat of death if he placed his hands on the ground, and then contradictory instructions to crawl instead with his hands on the ground with the threat of death if Mr. Shaver raised his hands.

137.    Defendant Langley rebuffed every attempt by Daniel to simply explain himself with a "shut up" and ignored Daniel's cries and his express pleas not to be shot.

138.    When Defendant Philip Brailsford, whom Defendant Langley personally designated as a lethal force officer, unjustifiably enacted Langley's orders and killed Daniel, Defendant Langley, like the other defendant officers, went into cover-up mode.

139.    Defendants compounded their violation of Plaintiff's initial unlawful arrest and false imprisonment by continuing that detention, handcuffed—including being handcuffed to a bench—for hours, despite the fact that there was never probable cause to believe that Plaintiff

30

1   was had committed any crime and despite the United States Supreme Court's prohibition of

2   prolonged detention of witnesses and/or people who have not committed a crime and/or for

3   whom there is no probable cause to believe that they have committed a crime.

4          140.   Defendants falsified their incident reports by omitting many details to try and

5   justify the wrongful murder of Daniel by Defendant Brailsford.

6          141.   Defendants are sued herein as "integral participants" in the violation of Plaintiff's

7   rights.

8          142.   Although each named Defendant's actions alone may not "rise to the level of a

9   constitutional violation," *Boyd v. Benton*, 374 F.3d 773, 780 (9th Cir. 2004), the integral

10  participation theory allows extends liability for the violations of Plaintiff's constitutionally-

11  protected rights to "those actors who were integral participants in the constitutional violation,

12  even if they did not directly engage in the unconstitutional conduct themselves." *Hopkins v.*

13  *Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009).

14         143.   Defendants Brailsford, Langley, Elmore, Doane, and Gomez were all integral

15  participants to the deprivation of Plaintiff's constitutionally-protected rights.

16         144.   In particular, Defendant Langley, in his supervision of the scene, and by his

17  treatment of and instructions to Plaintiff and to Mr. Shaver created an environment that

18  heightened the likelihood, and/or may have directly resulted in, Defendant Brailsford shooting

19  Mr. Shaver in front of Plaintiff.

20         145.   Defendant Langley was an integral participant in setting in motion the events that

21  led to Mr. Shaver's death. Moreover, the constitutional violation at issue is Defendants' unlawful

22  arrest of Plaintiff and excessive force and unlawful seizure of Mr. Shaver by lethally shooting

23  him.

24                                                                                              31

146.    It is clearly established that an officer may not shoot a citizen who is unarmed and complying with officers' instructions. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.").

147.    Defendants conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of Plaintiff and others. *See Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005).

## COUNT I: DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983 – FALSE ARREST / FALSE IMPRISONMENT

148.    Each and every foregoing allegation is herein incorporated by reference as if fully set forth.

149.    Defendants Brailsford, Langley, Elmore, Doane, and Gomez were state actors who were, at all times material to this Complaint, acting within the course and scope of their employment with the City of Mesa, Arizona's police department.

150.    At all times pertinent hereto, Defendants Brailsford, Langley, Elmore, Doane, and Gomez were acting under the color of law.

151.    Prior to engaging in their unlawful actions, including the use of unnecessary force against a citizen who posed no threat to the officers themselves or the public, Defendants Brailsford, Langley, Elmore, Doane, and Gomez had a duty to critically evaluate the facts on which they would rely to support their planned actions and to determine if such actions were objectively reasonable and in good faith under the totality of the circumstances.

152.    Defendants Brailsford, Langley, Elmore, Doane, and Gomez failed to exercise their duty to critically evaluate the facts on which they would rely to support their planned

1  actions and to determine if such actions were objectively reasonable and in good faith under the

2  totality of the circumstances and their actions were not objectively reasonable.

3      153.    During their interaction with Plaintiff in the hallway outside Daniel Shaver's hotel

4  room, Defendants Brailsford, Langley, Elmore, Doane, and Gomez had no reason to believe that

5  Plaintiff posed a threat of serious physical harm to them or anyone else.

6      154.    The actions undertaken by Defendants Brailsford, Langley, Elmore, Doane, and

7  Gomez violated that standard and resulted in the deprivation of Plaintiff's civil rights.

8      155.    The actions taken by Defendants City, Brailsford, Langley, Elmore, Doane, and

9  Gomez, and John/Janes Does 1-5 during their prolonged, unjustified, and unreasonable arrest

10  and detention of Plaintiff were such that, as a reasonable person, Plaintiff did not believe that

11  she was free to leave.

12      156.    Defendants Brailsford, Langley, Elmore, Doane, and Gomez were deliberately

13  indifferent to the rights of Plaintiff and others.

14      157.    The actions of Defendants Brailsford, Langley, Elmore, Doane, and Gomez

15  constituted false, unlawful, and/or unreasonable arrest in violation of her Fourth Amendment

16  and/or Fourteenth Amendment rights.

17      158.    The actions of Defendants Brailsford, Langley, Elmore, Doane, and Gomez were

18  not justified under clearly established law under the Fourth and/or Fourteenth Amendments to the

19  United States Constitution and resulted in the deprivation of Plaintiff's civil rights.

20      159.    Defendants Brailsford, Langley, Elmore, Doane, and Gomez were integral

21  participants in the prolonged warrantless, unjustified, and unreasonable arrest and detention of

22  Plaintiff.

23

24      33

160.    As a direct and proximate result of Defendants City, Defendants Brailsford, Langley, Elmore, Doane, and Gomez's actions, Plaintiff suffered pain and suffering and other damages to be proven at trial

161.    Defendants Brailsford, Langley, Elmore, Doane, and Gomez acted intentionally, maliciously and/or with deliberate indifference when they falsely, unlawfully, and/or unreasonably arrested Plaintiff and/or when they falsely, unlawfully, and/or unreasonably detained Plaintiff.

162.    Defendants intended to confine Plaintiff by handcuffing her at gunpoint.

163.    Plaintiff was conscious of the confinement, and it was against her consent.

164.    Plaintiff was not free to leave until hours of being handcuffed and led from the scene of the shooting, to a bench, to a law enforcement vehicle and finally to a new hotel room.

165.    Defendants' lacked probable cause to confine Plaintiff.

166.    The actions of the Defendants proximately caused damages to Plaintiffs in loss of liberty, embarrassment, humiliation and mental and emotional distress.

167.    In addition, the actions taken by Defendants City, Brailsford, Langley, Elmore, Doane, and Gomez, and Does 1-5 were willful, wonton, malicious, intentional, grossly indifferent and perpetrated with reckless indifference to the rights of Plaintiff.

168.    An award of punitive damages is necessary to punish this conduct and prevent this kind of mistreatment of citizens in the future.

## COUNT III: MONELL CLAIM UNDER 42 U.S.C. § 1983 RESULTING IN THE DEPRIVATION OF CIVIL RIGHTS

169.    Each and every foregoing allegation is herein incorporated by reference as if fully set forth.

34

170.    Defendant City of Mesa either maintains an official policy of a) permitting its police officers to use create circumstances in which force may appear to be justified absent the need for such force and/or b) permitting its officers to use excessive and unlawful force against citizens and/or c) permitting its police officers to illegally arrest and detain people unlawfully or, in the alternative, maintains a *de facto* policy of ignoring such actions by the officers employed by MPD including but not limited to Defendants Brailsford, Langley, Elmore, Doane, and Gomez.

171.    Defendant City of Mesa's knowledge of the illegal actions undertaken by Defendants Brailsford, Langley, Elmore, Doane, and Gomez, as described herein, can be inferred by the obviousness of the facts.

172.    Put simply, the actions complained of by Defendants Brailsford, Langley, Elmore, Doane, and Gomez were not secret and it is not possible for Defendants to have acted without the knowledge and permission of the City.

173.    Defendant City of Mesa's policy and practice of inadequate training and culture of ignoring wrongful, unreasonable, and/or excessive use of force by its police officers as well as ignoring false arrest and/or unlawful detention by Transit Security Officers and Mesa Police Officers was a moving force in causing Plaintiff to suffer violations of the rights and privileges afforded to her by both the United States Constitution and the Constitution of the State of Arizona.

174.    Upon information and belief, prior to the events giving rise to this Complaint, Defendant City of Mesa was aware of a widespread practice of the use of wrongful, unreasonable, and/or excessive use of force by its police as well as falsely arresting and unlawfully detaining citizens by its police officers.

175.    Despite this awareness, Defendant City of Mesa had a policy and practice of failing to adequately monitor, supervise, discipline and otherwise control its police officers.

176.    Defendant City of Mesa was aware of the substantial risk that allowing the custom of its police officers using excessive, unreasonable, and/or unlawful force against citizens would pose to the public but chose not to take the appropriate steps to protect citizens.

177.    Defendant City of Mesa was aware of the substantial risk that allowing the custom of its police officers to illegally arrest and/or detain citizens to continue would pose to the public but chose not to take the appropriate steps to protect citizens.

178.    Upon information and belief, Defendant City of Mesa's policymakers were deliberately indifferent as to the obvious consequence of police officers' widespread practice of needlessly using excessive, unreasonable, and/or unlawful force and the deprivation of civil rights that would arise therefrom, including the deprivation of Plaintiff's rights.

179.    Defendant City of Mesa's policymakers were deliberately indifferent as to the obvious consequence of its police officers' widespread practice of unlawfully detaining citizens and the deprivation of civil rights that would arise therefrom, including the deprivation of Plaintiff's rights.

180.    Upon information and belief, Defendant City of Mesa's deliberate indifference to the widespread practice among its employees and agents of needlessly using excessive, unreasonable, and/or unlawful force directly and illegally detaining and/or falsely arresting citizens and proximately caused the constitutional deprivation resulting in Plaintiff's injuries and damages, including her pain and suffering and other damages to be proven at trial.

181.    Plaintiff's injuries would have been avoided had Defendant City of Mesa either had a policy or enforced its own policies against unlawful force, and/or illegal detention and/or false arrest.

182.    Defendants' deliberate indifference led to its omission and said omission caused Defendants Brailsford and Langley to commit the constitutional violation.   Said violations include, but are not limited to: Defendant Brailsford's previous history and the custom inscriptions on Defendant Brailsford's firearm blatantly demonstrate a disregard for policies, procedures and/or constitutional rights.

183.    No punitive damages are sought against the City.

**WHEREFORE**, Plaintiff prays that the Court accept her complaint and order appropriate preliminary hearings on all issues susceptible to such hearings. Plaintiff further prays that the Court, after all preliminary matters are resolved and full discovery has been had, order trial of the case on its merits. Plaintiff further prays that following trial, this Court award nominal, compensatory, and punitive damages against Defendants Brailsford and Defendants John Does 1 through 7.  Finally, Plaintiff prays that this Court award her the costs of this action and reasonable attorney's fees, and such other and further relief as may be deemed just and equitable under the circumstances as described above.

Respectfully submitted,

**CHAVEZ LAW OFFICES, PA**
By:     _/s/ Gene N. Chavez_
Gene N. Chávez
Attorney for Monique Portillo
1220 5th Street
Albuquerque, NM 87102
505-243-4363
505-217-2157(facsimile)
gene@chavezlawoffices.com

37